[No. 2561.]

# JAMES M. BRALY v. MICHAEL REESE ET AL.

GUARDIAN OF INFANT UNDER MEXICAN LAW.—By the Mexican law prevailing in California before its annexation to the United States, the mother of an infant by a former marriage could not be continued as natural guardian, or be appointed guardian after her second marriage.

IDEM.—By said law the stepfather of an infant could be appointed its guardian, and the circumstance, that in the order making the appointment the mother was continued as natural guardian, did not invalidate the appointment of her husband.

JUDGMENTS OF ALCALDES IN SAN FRANCISCO.—In San Francisco, where, under Mexican domination, there was no judge of the first instance, the Alcalde was authorized to perform all the functions of such judge, and the rule of the common law applicable to the judgments of courts of general jurisdiction was applicable to the judgments of such Alealde.

SALE OF INFANT'S PROPERTY BY AN ALCALDE.—If the order of an alcalde, made in San Francisco, in 1849, appointing a guardian of an infant does not require in terms that the guardian give a bond or take an oath, and neither bond or oath is now found among the papers, and the record does not show that they were not given, it will be presumed, in support of the judgment of the Alcalde adjudging a sale of the infant's property, that the guardian qualified as such.

LOSS OF PART OF A RECORD.—If a guardian of an infant was appointed by an Alcalde in San Francisco, in 1849, and he afterwards acted as guardian, and was so recognized by the Alcalde, and no bond or oath of the guardian is now found among the papers, a trial court may, from the fact of such recognition, and from the lapse of time, and the known loose way of keeping such papers, find that the bond was given and oath taken.

APPOINTMENT OF GUARDIAN BY AN ALCALDE.—If a guardian of an infant appointed by an Alcalde failed to take the oath and give bond, and the Alcalde afterwards approved of the proceedings of the guardian, it is not certain that the appointment was void, or more than erroneous.

OBJECTION TO TESTIMONY.—Testimony which is not the best evidence of the fact sought to be proved is admissible, unless objected to on that precise ground.

GUARDIAN'S SALE OF INFANT'S PROPERTY.—The court cannot say, as a matter of law, that a guardian's sale of a minor's property, made by order of an Alcalde, for the purpose of procuring means to sustain and educate the minor, was not an indispensable cause of sale.

RIGHT OF GUARDIAN TO PURCHASE HIS WARD'S PROPERTY.—A guardian of an infant appointed by an Alcalde had the right, with the approval of the alcalde, to purchase his ward's property sold at auction by order of the Alcalde on the petition of the guardian.

APPEAL from the District Court, Fifteenth Judicial District, City and County of San Francisco.

Ejectment to recover the undivided one-half of fifty-vara lot one hundred and twenty-eight, in San Francisco. The lot was granted to Robert Smith by Edwin Bryant, Alcalde of San Francisco, on the 4th of March, 1847. Smith died in July, 1848, leaving a widow named Catherine, and three children: Daniel, aged six years; Hiram Joseph, aged four years; and Mary Catherine, a posthumous child. Daniel died in 1862. Hiram Joseph on the 26th of March, 1866, conveyed his interest in the lot to the plaintiff. ' This was the plaintiff's title.

The widow intermarried with Isaac Harrison, and afterwards, and on the 14th of June, 1849, presented to the Alcalde the following petition:

"To the Honorable Thaddeus M. Leavenworth, Alcalde and ex officio Judge of the Court of Probate, in and for the District of San Francisco, Upper California:

"The petition of Catherine Harrison, late widow of Robert Smith, deceased, aided and assisted by her husband, Isaac Harrison, of the said district of San Francisco, being residents, most respectfully represents:

"That her former husband, the said Robert Smith, died in the aforesaid district on the twenty-fifth day of July, in the year of our Lord one thousand eight hundred and forty-eight, leaving by his marriage with your petitioner three minor children under the age of puberty, to wit:

"Daniel Smith, about the age of six years; Hiram Joseph Smith, about four years of age, and Mary Catherine Smith, about or near one year of age; of which minor children she is by law the natural tutrix, and should be recognized by your honorable court as such, and be confirmed in her said capacity of tutrix.

"Your petitioner further represents that her late husband, the said Robert Smith, at the time of his death aforesaid, died possessed of a lot or parcel of ground in the town of San Francisco and other property; the said property being acquired during his marriage with your petitioner is therefore community property.

"Your petitioner further represents that it is necessary that an inventory and appraisement be made of the property

and succession of her said husband, deceased, who died intestate. The property being community property, your petitioner is the owner of one-half thereof in her own right, but that it is necessary to have the property all appraised together.

"That the lot is marked on the plat of the town of San Francisco, and is the same on which your petitioner now lives, and where her former husband, the said Robert Smith, died. That the said lot is numbered on the plat of said town as number one hundred and twenty-eight.

"The premises considered, your petitioner prays that your Honor will order that an inventory and appraisement be made of the property of the succession of her late husband, the said Robert Smith.

"Your petitioner further represents that at the time of her intermarriage with the said Isaac Harrison, there was a conflict of jurisdiction in this district and no settled exercise of the legal courts to have a family meeting convoked, or to have the succession properly administered.

"Your petitioner, therefore, alleges that her minor children have no relatives in the Territory of California, and that it is necessary that a family meeting should be convoked to approve of the intermarriage, and to re-establish her and confirm her in her rights as natural tutrix of her said minor children, and that her said husband, the said Isaac Harrison, be recognized as co-tutor of the said minor children.

"Your petitioner further represents that it is necessary that your Honor should appoint an under-tutor to attend said family meeting, according to law.

"Wherefore your petitioner prays as aforesaid: First, that your Honor will cause an inventory and appraisement to be made of the common property of your petitioner, and the succession of her late husband, the said Robert Smith; that a family meeting be convoked of five good men, friends of the deceased, to act as aforesaid; that an under-tutor be appointed by your honor to attend the said family meeting; that their proceedings be homologated and confirmed and approved by a decree of your honorable court, and that

such other order and decree in the premises may be made by your Honor as law and justice will allow.

"P. BARRY,
"Attorney for Petitioner."

On the same day the following proceedings were had:

"It is ordered that Barton Mowry be appointed under-tutor to the minor children of Robert Smith, deceased.

"Done in open court June 14, 1849.

"T. M. LEAVENWORTH,
"District S. F.

"Barton Mowry appeared in court and was duly qualified.
"Filed June 14, 1849.

"It is ordered that an inventory and appraisement be made, as prayed for in the petition.

"Done in open court at San Francisco, June 14, 1849.

"T. M. LEAVENWORTH,
"Alcalde D. S. F."

The following petition was presented on the 18th of June, 1849:

"To the Honorable Thaddeus M. Leavenworth, Alcalde and ex officio Judge of the Court of Probate in and for the District of San Francisco, Upper California:

"The petition of Catherine Harrison, natural tutrix of her minor children in the succession of her late husband, Robert Smith, deceased, whose succession is now open in your honorable court, duly aided and assisted by her husband, Isaac Harrison, co-tutor to the minory of said succession, and who joins her herein, most respectfully represents to your honorable court:

"That the property of said succession was acquired during the marriage of your petitioner with the said Robert Smith, deceased, and is therefore community property, your petitioner being entitled to one-half, and her minor children to the other half, as heirs of her late husband; that she is entitled, in her own right, to ask of your Honor a sale of the undivided property in order to effect a partition, and it is the duty of your Honor to order the same.

"Your petitioner further represents that the property is unproductive, and must continue so while it remains in the position it is at present; that means are necessary to sustain and educate those minor children as American citizens should; that there is a present necessity for a sale of the town lots, the property of the succession aforesaid in common with your petitioner as aforesaid, and the other property to the succession thereunto belonging.

That it would be to the evident advantage of said minors that the same should be sold, the present being a propitious time for the sale of the same; that a family meeting be ordered by your honorable court, and that they advise and direct on the subject of this petition, whether it be for the interest of the minors that the house and town lot be sold, whether the necessity calls for it, and that they recommend such terms of sale as will most promote the interests of the parties concerned.

Wherefore your petitioners pray that a family meeting be convoked, to consist of the nearest friends of the deceased Robert Smith; that they deliberate, advise and consult in relation to the subject-matter of this petition, in relation to advising and recommending the sale of the house and lot as described in the aforesaid petition; and your petitioners pray for general relief in the premises, and for such decree and order as may be necessary in the proceedings.

"P. BARRY,
"Attorney for Petitioner."

The following proceedings were then had:

"It is ordered, 'That a family meeting be convoked, as prayed for in the foregoing petition, to deliberate and advise in relation to the interest of the minors; that the meeting be composed of the following persons, viz.: Wm. Glover, Wm. Evans, Geo. T. Kittleman, Wm. Kittleman, and E. Ward Pell, and that they be notified to attend at my office at San Francisco, on the 19th inst., and that Barton Mowry, the under-tutor of said minor children, be also notified to attend the deliberations of said family meeting.'

"Done in open court, June 18, 1849.

"T. M LEAVENWORTH,
"Alcalde D. S. F."

Indorsed: "Filed in court this eighteenth day of June, and order issued according to the prayer of petition.

"T. M. LEAVENWORTH,
"Alcalde D. S. F."

"Pursuant to an order of court, in the succession of Robert Smith, deceased, dated the eighteenth day of June, 1849, I have convoked before me a family meeting, at my office, in the town of San Francisco, on the nineteenth day of June, in the year aforesaid, consisting of the following persons, friends of the deceased, to wit: William Glover, Wm. Evans, Geo. T. Kittleman, Wm. Kittleman, E. Ward Pell, and Barton Mowry, the under-tutor, duly qualified, all of whom having been sworn according to law, after deliberately consulting and advising on the subject of the prayer of both petitions, do advise and recommend as follows:

"That Catherine Harrison be retained in her capacity, natural tutrix of her minor children, Daniel, Hiram, and Mary Catherine Smith, and that her husband, Isaac Harrison, be appointed co-tutor.

"They further recommend and advise that, in view of the necessity of the case, it will be to the evident advantage of the said minor children, that the house and lot of ground be sold as prayed for.

"BARTON MOWRY, Under-tutor.
"WILLIAM GLOVER.
"WILLIAM EVANS.
"WILLIAM KITTLEMAN.
"GEORGE KITTLEMAN.
"E. WARD PELL.

"Done before me, in chambers, this nineteenth day of June, 1849.

"T. M. LEAVENWORTH,
"Alcalde D. S. F."

An appraisement and inventory were made. On the twenty-first of June, 1849, the following petition was presented to the alcalde:

"To the Honorable T. M. Leavenworth, Alcalde and Judge of the Court of Probate, in and for the District of San Francisco.

"The petition of Catherine Harrison, natural tutrix of her minor children, in the succession of her late husband's succession, Robert Smith, deceased, aided and assisted by her husband, Isaac Harrison, co-tutor to the said minor children, to wit: Daniel, Hiram Joseph, and Mary Catherine Smith, all under the age of puberty, most respectfully represents:

"That a family meeting has been held, in pursuance of an order of your honorable court; the process verbal is herewith annexed and made part hereof, in which, after having deliberated concerning the interests of the minors, they have advised in relation thereto. Wherefore, your petitioner prays that your honor will order and decree that their proceedings be homologated, and that the said property be sold, to wit: the house and lot situated in the town of San Francisco, being number 128 on the plat of said town, at the most suitable time and place, and in such subdivisions as your honor may prescribe, to promote the interest of your petitioner and the minors.

"Your petitioner further prays that the balance of the property, to wit: the personal property of the succession be adjudicated to her, at the appraised value, and for such other order and decree as may be just and lawful in the premises.

"P. BARRY,
"Attorney for Petitioner."

"Your petitioner would suggest the appended subdivision, dividing the lot in six parts, and prays the adoption thereof.

"P. BARRY,
"Attorney for Petitioner."

The following orders were then made:

"It is ordered and decreed, that the proceedings of the family meeting, referred to in the foregoing petition, be homologated and approved.

"It is further ordered and decreed, that Catharine Har-

rison be retained in the capacity of natural tutrix of her minor children, to wit: Daniel Smith, Hiram Joseph Smith, and Mary Catherine Smith, all under the age of puberty and children of the late Robert Smith, deceased; and that her present husband, Isaac Harrison, be appointed co-tutor for said minors, in pursuance of the recommendation of the family meeting referred to in the petition.

"It is further ordered and decreed, in pursuance of the recommendation of said family meeting, that the house and lot, number 128 on the plat of the town of San Francisco, be sold at such time and place, and in such subdivisions as will produce the highest price.

"Done in open court, June 21, 1849.

"T. M. LEAVENWORTH,
"Chief Magistrate District San Francisco, Upper California."

"It is further ordered and decreed, that the personal property of the succession be adjudicated to the petitioner for the appraised value, to wit: the sum of two hundred and forty-five dollars.

"Done in open court, June 21, 1849.

"T. M. LEAVENWORTH,
"Chief Magistrate District of San Francisco."

Pursuant to the order the alcalde sold the lot in six subdivisions, at public auction, on the twenty-fifth day of June, 1849, and Isaac Harrison, the guardian of the minors, became the purchaser of one of the subdivisions. The alcalde executed to each of the purchasers a deed, and all the conveyances, except that to Isaac Harrison, were signed by the mother as natural tutrix, and by the step-father as co-tutor of the infants. The deed to the guardian was also signed by the mother. The following is the conveyance to the guardian, and the others were in the same form:

"Know all men by these presents, that by virtue of a decree of the court of probate, in the succession of Robert Smith, deceased, after due notice given, I did offer for sale in the town of San Francisco, on the twenty-fifth day of June, A.D. one thousand eight hundred and forty-nine, at

my office-door, on Portsmouth Square, a certain lot situated
in the town of San Francisco, being part of a fifty-vara lot
marked on the plat of said town as number one hundred
and twenty-eight (128), containing thirty-one (31) feet front-
ing on Stockton street, and running back one hundred and
thirty-eight (138) feet, as will more fully appear from a dia-
gram on file in my office, the said lot being numbered six
(6) on said diagram, and Isaac Harrison being the highest
bidder, the said lot was adjudged to him for the price and
sum of six hundred and forty-three dollars ($643), which
is by these presents acknowledged to be paid.   Wherefore
the said lot is adjudged and conveyed to him, his heirs and
assigns forever; and now Catherine Harrison, natural tutrix
of the minor children, and Isaac Harrison, co-tutor of the
said minor children, herein concurring, acknowledged they
received the above price and sum of six hundred and forty-
three ($643) dollars.

"Signed, sealed, and delivered.

"I. C. DEXTER.
"H. I. McKINLEY.

"T. M. LEAVENWORTH, Probate Judge.                [L. S.]
" CATHERINE HARRISON.                              [L. S.]"

The defendants had acquired the title which passed by
the sale made by the alcalde.

The court rendered judgment for the defendants, and the
plaintiff appealed.

The other facts are stated in the opinion.

*J. A. Moultrie and William Matthews*, for the Appellant.

Catherine, the mother, having married a second husband,
was thereby rendered incompetent to be the guardian of her
children, and her attempted acts, as well as those of her
husband, were void.   Neither Catherine or Isaac took the
oath or gave the bond required by law.   This omission was
fatal to all their acts.   No letters of guardianship appear
to have been issued to Catherine or Isaac Harrison.   This
was essential.   The letters were, under the Spanish law,
more formal than under our own.   In the notes to Chap. 5,

Title 10, Book 1, of Febrero, pp. 142–46, and in Laws 94 and 95, Tit. 18, Partida 3, full forms are set forth for the guidance of notaries.

But even had there been a regular appointment and qualification of the so-called guardians, no debts were shown; and the existence of debts was needed to call into operation the jurisdiction of the court. By the laws of England and the United States, unaided by statute, no jurisdiction was vested in the court of chancery to order the sale of infants' lands. (*Russell* v. *Russell*, 1 Molloy, 525; *In the Matter of a Minor*, Id. 528; *Taylor* v. *Phillipps*, 2 Ves. Sen. 23; *Rogers* v. *Dill*, 6 Hill, 416; *Williamson* v. *Berry*, 8 How. 542.)

The purchase by Harrison and the attempted conveyance to him were both void.

The conveyance, as was said in *Boyd* v. *Blankman* (29 Cal. 34), "bears its own invalidity upon its face."

The Spanish law forbade guardians to buy at their own sales, " under the penalty of the nullity of the sale and the forfeiture of four times the value of the thing purchased to the Treasury." (Escriche, words Venta (sec. 15) and Tutor.)

Law 1, Tit. 12, Book 10, Novissima Recopilacion, declares that if the guardian buys any of the ward's property, publicly or secretly, the purchase will not avail, and the guardian shall forfeit four times its value to the Treasury.

*S. M. Wilson*, for the Respondent.

Under the Spanish law there were three species of guardian; the *testamentary*, appointed by will; the *legitimate*, appointed by *operation of law*, being the nearest relation of the minor for whom no guardian had been appointed by will; and the *dative*, appointed at the discretion of the judge when the minor had no testamentary guardian and no relations.

The guardian was called the *tutor* or *tutrix*, and the guardianship, however created, continued till the minor, if a male, reached the age of fourteen years, and if a female, the age of twelve years.

A female was not allowed to become a guardian, unless the mother or grandmother of the minor; and before as-

suming the office she was required to promise before the king or judge that she would not marry while she had the minor under her guardianship, and would also renounce the protection which the law gave to women in prohibiting them from obligating themselves for others. (Partida 6, Tit. 16, Laws 2, 3, 4, 9, 12 (2 Moreau & Carleton's Partidas, pp. 1124–1133); Escriche, words Tutela, Tutor, Tutora, or Tutrix, pp. 1517–1519.)

By the Court, McKINSTRY, J.:

I. Catherine Harrison could not be continued as natural tutrix, nor be appointed dative tutrix, after her second marriage.

In France, a widow about to marry and desiring to retain the guardianship of her infant children, should secure the assent of a "family meeting" *before* the second marriage. "If the mother, being guardian, desires to marry again, she is required, *before the act of marriage,* to convoke a family council, who shall decide whether the guardianship ought to be continued to her. In default of such convocation she shall *lose the guardianship entirely;* and her new husband shall be jointly and severally responsible for all the consequences of the guardianship which she shall have unduly continued."[*]

In Louisiana, when the minor is the child of a first marriage, and the mother has already contracted a second, the judge may confer the tutorship on her "upon the advice of a family meeting convoked for that purpose."[†]

By the law of Mexico, however, where "family councils" are unknown, the mother who marries a second time, "by that act alone," loses the tutory.[‡]

In Spain, after the order of April 12, 1839, she could apply on petition, for dispensation of the legal prohibition.[§] But the royal order permitting this application was issued after the establishment of Mexican independence, and never had operation in Mexico.

[*] Code Napoleon, Art. 395, Book 1, Title IX., Ch. 2, Sec. 1.
[†] Code of Practice, La., 1870, Art. 951.
[‡] Febrero, Book 1, Title 10, Chap. 1, Sec. 4.
[§] Escriche, tit. "Tutora."

The order purporting to continue Catherine Harrison as tutrix was void, and by that order the alcalde did not obtain jurisdiction of the infants.    He cannot be said to have acquired jurisdiction of the persons of the infants by appointing as tutrix one whom he had no power to appoint— the incapacity of the appointee appearing on his record of the proceedings.

II.  But Isaac Harrison was appointed "co-tutor," and learned counsel have failed to call to our attention any express inhibition of the Spanish or Mexican laws upon the appointment of the *stepfather* as tutor.   He is not included in the list of those declared to be incapable by the Code Napoleon, or by the Civil Code of Louisiana.*

The prohibitions of the Mexican law extended to women (except in certain instances), to minors, to deaf, dumb, and totally blind persons, to debtors and creditors of the pupil, to soldiers in actual service, to monks, and to others, but not to the stepfather.†

This Court cannot supplement the list declared to be incapable by express provision of the Mexican Codes.   It is, at least, doubtful whether our ruling could be based on an assumed *policy* of the Mexican law, as suggested by express provisions bearing on a subject.   If this could ever be done, still we cannot, in the present instance, declare that it must have been intended that the stepfather should not be named tutor, because the mother lost the tutory on her marriage to her second husband.   Indeed, the policy of different ages and nations has been so variant in respect to the persons proper to receive this trust of guardianship, that a just inference cannot be drawn that one class was intended to be excluded, because another was expressly excluded.

The common law of England gave the guardianship *in socage* to the next of blood of the child to whom the inheritance could not possibly descend, while, first the father, and then the mother, became guardian *by nature*, with charge of the *person* of the infant.   The guardianship of the property

---

* C. N., Book.1, Title 10, Chap. 2, Sec. 7.   Civil Code, La., Book 2, Title VIII., Chap. 1, Sec. 9.

† Escriche, tit. "Tutor."

of the infant was apparently committed by the *civil law* to the person who was entitled to the emoluments of the succession. The law of Scotland, and the ancient law of France, committed the pupil's estate to the person entitled to the legal succession, because he is most interested in preserving it from waste; but excluded him from the custody of the pupil's person, because his interest is placed in opposition to the life of his pupil.*

In view of the different ideas which have prevailed upon the subject, it would be extremely imprudent to impute a policy not expressed, or to assume the existence of any implied prohibition.

There was no limitation which excluded the stepfather in the appointment of *chancery guardians.* Under our statute he may be appointed guardian.†

The Mexican law, like the common law of England, recognized the power of the husband over the wife. By the latter law the husband and wife were regarded as one person, and her legal existence was, *in a degree,* lost or suspended. Yet she retained some rights, which she could exercise independent of her husband, and chancery often afforded her relief as against the husband himself. It may be true that the laws of Mexico gave wider scope to the independent action of the wife, yet in many respects her condition was inferior to that of her husband.‡ She lost the power of exercising separately many civil rights.§ In Mexico the husband is the head of the family, and the wife is bound to live with him and to follow his every reasonable change of domicile.

There were reasons, therefore, why the mother, under the lawful restraint and natural influence of her second husband, should not be continued in the guardianship, which did not

---

* Kent's Comm., Vol. II., 222.

† C. C. Cal., Sec. 236, et seq.

‡ "In multis juris nostri articulis deterior est conditio foeminarum quam masculorum." Escriche, tit. "Varon."

§ "La majer que se casa pierde la facultad de ejercer por si sola la mayor parte de sus derechos civiles: el interes de la associacion conyugal y la deferencia que debe à su marido la obligan à no hacer jamas cosa importante sin su autorizacion." Escriche. "Mujer casada."

apply to *his* appointment; he subjecting himself to the direction of the proper officer.

It was the evident purpose of the attorney who conducted the proceedings under review, that the same should take the course provided for by the Louisiana practice; that a "family meeting" should continue Catherine Harrison as "natural tutrix;" that her husband, Isaac Harrison, should be named " co-tutor," and that an *under-tutor* should be appointed. The alcalde undertook to "homologate" the action of the family meeting. Reading the record, one might suspect that the attorney who conducted the proceedings had removed to California from the State of Louisiana.

Nevertheless, Isaac Harrison was appointed tutor. The circumstance, that, in the same order, there was an attempt to continue his wife as natural tutrix, did not invalidate the appointment of her husband, nor derogate from the effects of his subsequent acts.

III. Holding that Isaac Harrison might properly be appointed tutor, little consequence is to be attached to the omission (in the loose papers found in the custody of the county clerk) of an oath of office or bond.

First. In support of the judgment of the court below we may imply a finding that these papers are lost or have been destroyed. After the great lapse of time, and in view of the mode in which the minutes of the proceedings were kept, as well as of the subsequent recognition of Harrison, in his capacity of tutor, by the alcalde, and especially of the approval by that officer of the sale to him, the District Court may well have found such loss or destruction of the written evidence of the oath or bond. *Prior* v. *Downey,* 50 Cal. 388, has no application to the present case. There the alleged appointment of an administrator was, by its terms, conditional and not absolute; and there was also an express finding by the District Court, that the person claiming to act was never appointed administrator, and never qualified as such.*

Second. The record does not show but that Isaac Harri-

---

* 50 Cal. 399.

son took the oath and gave bond. In *Ryder* v. *Cohen,* 37 Cal. 69, it was held, in effect, that the rule of the common law applicable to courts of general jurisdiction should be applied to the courts of first instance, and except where the records show the contrary, they should be held to have acquired jurisdiction of the persons of the parties in interest.*

The same rule was applicable to the judgment of the alcalde in the present instance, since there being no judge of first instance in the district of San Francisco, the alcalde was authorized to perform all the functions of such judge.†

The rule referred to had no application to the Courts of Probate under our State Constitution prior to the act of March 27, 1858, " to give to the proceedings of Courts of Probate the same effect as courts of general jurisdiction," because, before that act, the Courts of Probate were considered courts of inferior and limited jurisdiction; and therein is to be observed another distinction between the present and the case of *Prior* v. *Downey,* and other like cases.

Applying the rule mentioned to the proceedings in the alcalde's court, and in view of the adjudication of the sale by that judge, we must assume that Isaac Harrison did "qualify" as tutor, because the record does not affirmatively show that he did not.

*Third.* Nor are we prepared to admit that if the record showed the failure to take oath and give bond, the subsequent judgment of the alcalde approving of the proceedings of the tutor, notwithstanding the failure, would be void, or more than erroneous. The appointment was of a competent person, and it is by no means certain that the regularity of the mode of the appointment involves a question of jurisdiction.

*Fourth.* It would seem that by the strict letter of the Mexican law the failure of the appointee to take an oath, or give security, did not render the appointment invalid.‡

* 37 Cal. 69.

† *Mena* v. *Le Roy,* 1 Cal. 202; *Panaud* v. *Jones,* Id. 508.

‡ Partida 6, Title XVI., Law 12. Gregoria Lopez, note 28, verb. " bueno y rico:" Febrero, Book 1, Title 10, Chap. 1, Sec. 12.

Much of what is said above will apply to the absence of the letters of appointment. But, further, the letters, if issued, would be in the possession of the tutor, and, if it be assumed that the letters are better evidence than the minutes of the appointment (and also—although the sale was adjudicated—that the objection, if made, would have been an effective objection)—the precise objection that defendant did not offer the best evidence of the appointment was not made by the plaintiff in the court below.

IV. It was manifestly within the jurisdiction of the alcalde to determine whether the petition presented to him showed proper cause for the sale of the real estate of the infants. "Tutors or curators ought not to sell, etc., unless it should be to pay the debts of the father, to marry other children of the father, or for other indispensable causes," etc.* We cannot say that the cause set forth in the petition was not indispensable, within the meaning of the law.

V. The tutor had authority, with the approval of the judge, to purchase at the auction sale, and the deed of the alcalde to Isaac Harrison conveyed the title.

The sale was ordered and conducted by the alcalde, and must be held to have received his judicial sanction and approval.

By a law of the Partidas, it is decreed: "And we say that no guardian can purchase anything belonging to the estate of his pupil, unless authorized to that effect by the local judge, or some other guardian who has a joint care of the minor with himself."†

There can be no doubt that the foregoing would permit the purchase by the tutor of his pupil's real estate, when the purchase is approved by the local judge, although, when there is a co-tutor, his assent may also be necessary.‡

It is said, however, that the doctrine of the Partidas is in direct conflict with Law 1, Title 12, Book 10, of the Nov-

---

* Febrero Novisimo, Lib. 1, Title 4, Chap. 3, Secs. 9, 10.

† Partida Fifth, Title V., Law 4; 2 Mareau & Carleton's Partidas 663, 863: 1 Feb. Novis., Lib. 1, Title 4, Chap. 3.

‡ Lopez' Com. Partida Fifth, Title 5, Law 4 Note 10, Verb. "con otorgamiento."

isima Recopilacion. If this be so, the latter must prevail.*

That law may be translated: " every man who is an agent or guardian of orphans, or of other persons, is unable, nor ought he to buy any of the property of the person for whom he administers; and if he shall so buy, publicly or privately, the purchase will not be valid, and will be set aside, and four times the value of the property bought will be forfeited to our treasury."

This language does not necessarily imply a repeal of the older law. Property may be purchased openly (publicly, without concealment,) yet not under the supervision of a judicial officer. Had it been the intention to put an end to such sales in the presence of the judge we may suppose that the intention would have been expressed in unmistakable words. The law found in the Nueva and Novisima Recopilacion is contained in an older body of royal ordinances—the Ordenanzas Reales de Castilla—and its object is explained by a learned commentator on the Partidas. In his commentatory on Law 5, Title 5, of the Fifth Partida, Gregorio Lopez says, that in his day (by virtue of Title five, book five of the Ordenanzas Reales—which is a reference to the same law as that found in the Recopilaciones) it was not permitted to a tutor or curator, either publicly or privately, to buy his ward's property; but whether by that ordinance the law of the Partidas, on which he is commenting, was changed so that a tutor could not buy his ward's property,

---

* Schmidt's Civil Law of Spain and Mexico, Historical Outline, p. 88. It has been asserted that the Novisima Recopilacion is not authority in the Mexican courts. Philip IV, by a law found in the Recopilacion de las Indias, decreed that no law enacted for Spain should be obligatory in America, unless accompanied by a *cedula* to that effect, emanating from the council of the Indies. (Schmidt, H. O. p. 95.) The Royal *cedula* which sanctioned the publication of the Novisima Recopilacion did not declare that it should be in force in America. " Yet as it embodies nearly all the provisions of the *Nueva Recopilacion*—declared to be binding by the Laws of the Indies—its authority is unques'ionable." (Id. p. 98.) It is certain that the laws found in the Novisima, which are also found in the Nueva Recopilacion, are of binding force in Mexico; and the Law 1, Title 12, Book 10, of the Novisima Recopilacion is Law 23, Title 11, Book 5, of the Nueva Recopilacion. The Law of the Novisima Recopilacion, as well as the Law of the Partidas, is found in the " Pandectas Hispano Mejicanas," which profess to give the Spanish Laws in force in Mexico. There can be but little doubt that the law cited from the 5th Partida and that cited from the Novisima Recopilacion are both considered in force in Mexico. (Note 3, Sec. 10, Febrero Novisimo, Lib. 1, Title 4, Chap. 3. Febrero Mejicano " nuevamente adic.," etc por et Lic. Anastasio de la Pascua, B. 1, T. 4, Ch. 3, S. 10.

even with the sanction of the judge, was questionable. At first view it would seem so, because under the Partidas a tutor could not buy without the approval of another tutor, or of a judge; he could not interpose his own authorization in favor of himself. Nevertheless, that the Ordenanza did not change the law of the Partidas, seems to be the better construction. For by the ancient common law, (the Roman law,) according to the prevailing opinion, a tutor could buy of a ward, above infancy, (more than fourteen years of age,) without other authorization than his own, if he did it openly and in good faith. In support of this he cites certain commentators on texts of the Roman law, to which he refers. In the opinion of Lopez it was this practice—the practice of dealing with the ward without the express approval of the judge or co-tutor—which the law of the Ordenanzas Reales (since copied into the Recopilacion) was intended to prohibit. If, therefore, he adds, the tutor buys in good faith, with the approval of the judge or of the other tutor, his purchase is valid, as set forth in the law of the Partidas.*

It would seem that the construction, said by Gregorio Lopez to be the true one, is recognized by Aso and Manuel in their work "Institutes of the Civil Law of Spain."†

In view of the language of the laws and of the purpose for which the later law seems to have been promulged, as well as of the construction given by the Spanish writers we have consulted, we are of opinion that the law found in the Novisima Recopilacion did not repeal the law of the Partidas.

Judgment and order denying a new trial affirmed.

---

* "Hodie, por 1, Ordin. tit. 5, lib. 5, neque publicé nequo clám licet tutori vel curatori emere res minorum; sed an per illam legem corrigatur ista, ita quod neque liceat tutori emere rem pupilli etiam cum auctoritate judicis vel alterius contutoris?"

"Videbatur, quòd sic, quia in casu illius legis non poterat tutor alius emere nisi auctorante alio tutore, vel judice; quia ipse non protest sibi suam auctoritatem interponere. * * * Contrarium tamen, imó, quod illa lex non corrigat istam videtur verius; nam et de jure communi antiquo, secundûm communem opinionem, tutor, se auctorante, potest emere a pupillo majore infante, palàm et bona fide. Istum ergo casum tantum corrigit illa nova lex: Si ergo emat bona fide cum auctoritate judicis, vel alterius tutoris, poterit ut hic habetur." *Gregorio Lopez' Comm. Partida 5, 1itle 5, Law 4, Note 9, Verb. de aquel.* He cites many writers who sustain his view.

† Translation (by Johnson) 1. White's Recopilacion, p. 16.

CROCKETT, J., concurring:

I concur in the opinion of Mr. Justice McKinstry and also in the judgment. But independently of the reasoning of the opinion, I think the judgment should be affirmed on the authority of *Ryder* v. *Cohen*, 37 Cal. 69.

RHODES, J., dissenting:

I dissent from the opinion of Mr. Justice McKinstry upon the third, fourth and fifth points discussed by him, and also from the judgment.